Filed 10/5/20  Tayefeh v. Kern Medical Center CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FARZIN TAYEFEH et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> KERN MEDICAL CENTER et al., <br><br> Defendants and Respondents. | F077060 <br><br> (Super. Ct. No. BCV-15-100647) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Thomas S. Clark, Judge.

Fenton Law Group, Benjamin J. Fenton, Dennis E. Lee and Randy Hsieh for Plaintiffs and Appellants.

Hall, Hieatt & Connely, Mark B. Connely and Stephanie A. Bowen for Defendants and Respondents.

-ooOoo-

**INTRODUCTION**

Plaintiff and appellant Farzin Tayefeh, M.D. (Tayefeh), along with Farzin Tayefeh, M.D., Inc. (collectively, plaintiffs), appeal a jury verdict in favor of defendants and respondents Kern Medical Center (KMC) and the County of Kern (collectively, defendants) finding KMC did not violate its medical staff bylaws[1] in terminating Tayefeh's hospital staff privileges at KMC in January 2015.

On appeal, plaintiffs claim the trial court erred in modifying or refusing to give plaintiffs' proposed special jury instructions and erred in excluding plaintiffs' expert witness as lacking necessary expert qualifications. We conclude the trial court prejudicially erred in excluding plaintiffs' expert witness, and we reverse the judgment and remand for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

For the time period relevant to this appeal, KMC had an exclusive provider agreement with Resource Anesthesiology Associates and Somnia, Inc. (collectively, Somnia) to provide qualified anesthesiologists to work at KMC. Evidence submitted at summary judgment and during trial indicated that anesthesiologists who entered into independent contractor agreements with Somnia were initially supplied an application for temporary hospital privileges at KMC. If, after temporary privileges were granted by KMC, and if Somnia determined the anesthesiologist was suitable to continue working under the independent contractor agreement, Somnia would request that KMC allow the anesthesiologist to apply for full staff membership/privileges. No application for full privileges was offered to the physician until Somnia requested KMC to offer the application.

---

[1] All further references to bylaws are to the KMC medical staff bylaws unless indicated otherwise.

The two applications were largely the same, but the full staff membership application was lengthier and took up to 180 days to process and approve whereas the temporary privileges application took only a matter of days or weeks to process and approve. Only physicians who came to the hospital through an exclusive provider agreement were offered an application for temporary privileges; all other physicians generally were required to complete the lengthier application for full staff membership privileges at the outset.

Tayefeh applied to work as an anesthesiologist with Somnia at KMC in 2014. He signed a two-year independent contractor agreement with Somnia wherein Tayefeh consented that the contract was subject to immediate termination if Tayefeh failed to obtain clinical privileges from KMC, or his privileges were suspended or revoked by KMC. Upon agreeing to the contract with Somnia, Tayefeh completed KMC's application for temporary/*locum tenens* privileges, which KMC granted.[2] Upon applying for the temporary privileges, Tayefeh was provided with the bylaws to which Tayefeh, under the terms of his temporary privileges application, agreed to adhere. The temporary privilege application also stated that any denial or termination of temporary privileges was subject to notice and hearing rights as provided in the bylaws.

Under the bylaws, a physician who has been awarded full staff membership privileges or who is applying for full staff privileges has different rights than one who has been awarded only temporary staff privileges. Any physician who applies for full staff membership privileges is entitled to notice and hearing rights if that application is denied for any reason. Further, a physician awarded full staff membership may not have his or her hospital privileges reduced, suspended, or terminated for any reason without notice and hearing procedures.

---

[2] *Locum tenens* means a physician who acts as a temporary substitute for another. (*Bode v. Los Angeles Metropolitan Medical Center* (2009) 174 Cal.App.4th 1224, 1234, fn. 5.)

A physician awarded temporary staff privileges, however, is subject to KMC's bylaw provision 7.5-4(C), which provides as follows:

> "Temporary privileges may at any time be terminated, with or without cause, by the president of staff, the chair of the department, or the medical director after conferring with either of the foregoing. **The practitioner shall be entitled to the hearing and appellate rights afforded in Article XIII of these bylaws only if temporary privileges are terminated or suspended for medical disciplinary cause or reason.** In all other cases, the individual shall not be entitled to any hearing and appellate rights based upon an adverse action involving temporary privileges. All persons requesting or receiving temporary privileges shall be bound by the bylaws, rules and regulations of the medical staff. All practitioners with temporary privileges will be subject to the proctoring procedure of the medical staff." (Boldface added.)

One of the obligations of the medical staff in the bylaws, section 6.4-2(K), is "an ongoing and continuous duty to report to the medical staff office within ten (10) days any and all information that would otherwise correct, change, modify or add to any information provided in the application or most recent reappointment application when such correction, change, modification or addition may reflect adversely on current qualifications or membership or privileges."

Notably, the application for temporary privileges that Tayefeh completed sought information whether he had ever had his application or license to practice medicine in any jurisdiction denied, limited, restricted, suspended, revoked, not renewed, or subject to probationary conditions, or whether he had been fined or received a letter of reprimand for a licensing agency, *or whether he was subject to such a pending action*. He answered "No" to this question.

Tayefeh commenced work at KMC on January 5, 2015, with temporary privileges that extended through March 4, 2015. However, on January 21, 2015, the Medical Board of California (MBC) notified KMC that the MBC had filed an accusation against Tayefeh

4.

on December 31, 2014.[3] Although the bylaws required Tayefeh to report that accusation to KMC within 10 days of its filing, Tayefeh had failed to do so. The MBC accusation contained allegations that Tayefeh had been prescribing controlled substances such as Ambien, Zanax, hydrocodone, and testosterone to his spouse without good faith examinations and without maintaining adequate patient records.

KMC's Chief Medical Officer, Glenn Goldis, and the Chief Executive Officer, Russell Judd, met to discuss the MBC accusation. Goldis indicated they decided to terminate Tayefeh's privileges for two reasons: (1) for failing to timely disclose the accusation to KMC and (2) the serious nature of the accusation's allegations. Neither basis was considered by KMC to be a "medical disciplinary cause or reason[]" under section 7.5-4(C) of the bylaws, therefore no notice and hearing rights were deemed to attach. Goldis directed the department chair, Dr. Chou Yang, an anesthesiologist also contracted with Somnia, to inform Tayefeh his temporary staff privileges were terminated as was Tayefeh's independent contractor agreement with Somnia. Yang testified he met with Tayefeh and delivered that information and the two discussed the nature of the accusation; Tayefeh testified Yang told him nothing about why he was being asked to leave the hospital.

Somnia subsequently sent a letter to Tayefeh restating the independent contractor agreement between them was terminated, which the human resources officer for Somnia testified was because Tayefeh's staff privileges at KMC were terminated—without staff privileges, Tayefeh could not meet his obligations to Somnia to provide services at KMC.

---

[3] The MBC is a consumer protection agency within the Department of Consumer Affairs consisting of a 15-member Board of eight physicians and seven public members appointed by the Governor, the Speaker of the Assembly, and the Senate Rules Committee. (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 7; Bus. & Prof. Code, §§ 101, subd. (b), 2001, subds. (a)–(c).) The purposes of the MBC are to protect consumers from incompetent, grossly negligent, unlicensed, impaired, or unethical practitioners, among other things. (*Arnett v. Dal Cielo*, *supra*, at p. 7.)

Thereafter, Tayefeh filed suit against KMC alleging several claims, including one under Business and Professions Code section 809 et seq. and a common law claim for violation of Tayefeh's right to fair procedure.[4]  Following demurrer proceedings, Tayefeh's only remaining claim was framed as one under section 809 et seq.  At summary judgment, Tayefeh characterized the claim as a violation of section 809.6, subdivisions (a) and (b), based on KMC's alleged failure to give Tayefeh sufficient notice and a hearing under the bylaws.[5]

At the hearing on KMC's summary judgment motion, the trial court explained that conflicting evidence created a disputed issue of fact as to the meaning of the phrase "medical disciplinary cause or reason[]" in section 7.5-4(C) of the bylaws.  The case proceeded to trial where expert testimony as to the meaning of medical disciplinary cause or reason was offered by KMC.  Tayefeh's expert, however, was deemed unqualified and was precluded from testifying.

The jury was instructed to interpret the phrase medical disciplinary cause or reason contained in the bylaws, and based on how they interpreted that phrase, the jury was directed to determine whether Tayefeh had proven he was entitled to notice and hearing rights regarding the termination of his temporary privileges.  During deliberations, the jury sent a question to the court whether the law governing the phrase "medical disciplinary cause or reason[]" included termination of privileges for physician conduct that occurred away from KMC.  (Bylaws, § 7.5-4(C).)  The court referred the jury to the

---

[4]    All further statutory references are to the Business and Professions Code unless noted otherwise.

[5]    Section 809.6, subdivision (a), provides that the parties are bound by any additional notice and hearing provisions contained in any applicable professional society or medical staff bylaws that are not inconsistent with sections 809.1 to 809.4.  Section 809.6, subdivision (b), provides that the parties are also bound by any additional notice and hearing provisions contained in any applicable agreement or contract between the licentiate and peer review body or health care entity that are not inconsistent with sections 809.1 to 809.4, inclusive.  Sections 809.1 to 809.4 detail the minimum fair procedures that must be provided to licentiates with hospital staff privileges.

6.

bylaws and instructed them to determine the meaning of the phrase for themselves. The jury then sent a note to the court indicating they could not reach a decision; the court instructed them to resume deliberations, and the jury ultimately returned a nine-to-three verdict in favor of KMC.

Tayefeh subsequently appealed, arguing that the trial court erred by excluding his expert witness as unqualified and erred in refusing the special jury instructions Tayefeh requested. At our request, the parties filed supplemental briefs regarding relevant new authority and how section 805 may relate to the interpretation of the bylaws.

## DISCUSSION

### I.    Exclusion of Plaintiffs' Expert Witness Arthur Chenen

The bylaws provide that a physician with temporary privileges is entitled to notice and hearing procedures delineated in the bylaws only if the privileges are revoked for a "medical disciplinary cause or reason." (Bylaws, § 7.5-4(C).) The parties disputed the meaning of that phrase and whether terminating Tayefeh's staff privileges based on the allegations contained in the MBC accusation or due to Tayefeh's failure to report the accusation to KMC constituted a medical disciplinary cause or reason that triggered notice and hearing rights under the bylaws.

At trial, the court framed the issue as one primarily involving the construction of the terms of a written instrument, subject to the principles of contract interpretation, although the jury was given instruction on negligence.[6] KMC's expert opined how the disputed phrase is understood and interpreted in his experience in the industry and that the termination of Tayefeh's staff privileges was not based on medical disciplinary reasons; plaintiffs' expert was excluded as unqualified. Accordingly, whether that exclusion amounted to prejudicial error must be examined within the framework of

---

[6]    The trial court and counsel discussed whether a violation of section 809.6 was akin to a negligence cause of action or a breach of contract claim. The jury was instructed on some relevant principles of contract interpretation and negligence.

7.

contract interpretation principles and how extrinsic evidence, such as expert opinion about industry standards, customs and practices, is to be considered to interpret the terms of a written instrument.

### A. Interpreting the Bylaws in Light of Industry Customs and Standards

### 1. Principles of Interpretation

Although not necessarily constituting a contract, a hospital's bylaws are written instruments the terms of which have been deemed subject, in certain circumstances, to the rules of contract interpretation. (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 753–754 [applying contract interpretation canons to deduce the meaning of hospital bylaws, but emphasizing that doing so may be dependent on the nature of the provisions at issue].)

"Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1140–1141.) Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.)

The interpretation of a contract thus involves a two-step process. The court first provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine whether the language of the agreement is reasonably susceptible to the interpretation urged by a party. If, after considering the extrinsic evidence offered, the court determines the language is reasonably susceptible to the

8.

interpretation, the extrinsic evidence is admitted to aid in the second step—interpreting the contract.  (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165–1166; *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1350–1351.)[7]

"Extrinsic evidence is thus admissible to interpret the language of a written instrument, as long as such evidence is not used to give the instrument a meaning to which it is not reasonably susceptible.  Where the interpretation of contractual language turns on a question of the credibility of *conflicting* extrinsic evidence, interpretation of the language is not solely a judicial function.  [Citations.]  As trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of the contract."  (*Morey v. Vannucci*, *supra*, 64 Cal.App.4th at pp. 912–913, fn. omitted; see *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 ["Juries are not prohibited from interpreting contracts[]" where the "construction turns on the credibility of extrinsic evidence"].)

## 2.  Extrinsic Evidence of Industry Custom and Standards

How particular terms are used or interpreted within a particular industry is a type of extrinsic evidence that may establish an ambiguity in the language of a written instrument.  (See *Wolf v. Superior Court*, *supra*, 114 Cal.App.4th at p. 1355.)  Indeed, parties are presumed to contract pursuant to a fixed and established usage and custom of the trade or industry (*Ermolieff v. R.K.O. Radio Pictures* (1942) 19 Cal.2d 543, 550), and contract terms must be interpreted according to any special meaning given to them by usage, and technical terms are interpreted as generally understood in the industry (Civ. Code, §§ 1644, 1645).

---

[7]  In their supplemental briefs, the parties present arguments about whether and how a hospital's statutory reporting requirements under section 805 influence the interpretation of the bylaws.  That issue is relevant to whether the testimony of the experts, along with other extrinsic evidence, supports an interpretation of the bylaws that is reasonable in view of a hospital's reporting duties under section 805 and the underlying public policy concerns.

The parties disputed how the phrase medical disciplinary cause or reason is generally understood in the industry and what type of adverse action with respect to a physician's staff privileges is of a medical disciplinary nature that would trigger KMC's notice and hearing provisions. That phrase has particular significance in the medical industry because it frames a hospital's statutory reporting duties to the MBC when suspending, revoking or terminating staff privileges, and triggers statutory notice requirements and peer review hearing procedures. (See *Economy v. Sutter East Bay Hospitals* (2019) 31 Cal.App.5th 1147 (*Economy*); *Alaama v. Presbyterian Intercommunity Hospital, Inc.* (2019) 40 Cal.App.5th 55 (*Alaama*).)

Among the numerous statutory and regulatory laws designed to address the interests of patients, physicians, and hospitals, as well as concomitant public policy concerns, hospitals are statutorily obligated to report to the MBC certain adverse actions taken by a peer review body with respect to denying, terminating, suspending, or reducing a physician's staff privileges. Specifically, section 805 requires that a report be filed with the applicable licensing agency when, as a result of an action of a peer review body, "[a] licentiate's membership, staff privileges, or employment is terminated or revoked for a medical disciplinary cause or reason[]" or "[r]estrictions are imposed, … on staff privileges, membership, or employment for a cumulative total of 30 days or more for any 12-month period, for a medical disciplinary cause or reason." (§ 805, subd. (b)(2), (3).) Staff privileges are defined to include, among other things, temporary privileges. (*Id.*, subd. (a)(4).) The statute defines "'[m]edical disciplinary cause or reason' [to] mean[] that aspect of a licentiate's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (*Id.*, subd. (a)(6).)[8]

---

[8] The bylaws track this definition in article XII, section 12.2-5(K), which sets out actions to be taken by the medical executive committee in peer review processes: "If the medical executive committee takes any action that would give rise to a hearing pursuant to Bylaws,

10.

Along with the duty to report such adverse actions to the MBC, hospitals also have a duty to provide certain protections to a physician in proceedings regarding his or her staff privileges. (*Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 815 ["[A] physician may neither be refused admission to, nor expelled from, the staff of a hospital, *whether public or private*, in the absence of a procedure comporting with the minimum common law requirements of procedural due process .…"] (*Anton*), abrogated by statute on other grounds as recognized in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 678, fn. 11.)[9] In 1986, California implemented a peer review process to "'protect the health and welfare of the people of California by excluding through the peer review mechanism "those healing arts practitioners who provide substandard care or who engage in professional misconduct[,]" [Citation.]'" and the Legislature codified the common law fair procedures a hospital must afford practitioners in the peer-review process. (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 988 (*El-Attar*).)

The specific type of notice and hearing fair process rights that physicians are to be provided during peer review processes are codified under sections 809.1 to 809.4, but those sections do not apply to county and state hospitals such as KMC (§ 809.7). Nonetheless, county and state hospitals are obligated to provide fair procedures and due process to physicians through notice and an opportunity to be heard in matters affecting staff membership privileges. (*Ibid.*)

In that regard, California law requires an acute care hospital's medical staff to adopt written bylaws that establish formal procedures for evaluating "staff applications

Section 13.2, it shall also make a determination whether the action is a 'medical disciplinary' action or an 'administrative disciplinary' action. A medical disciplinary action is one taken for cause or reason that involves that aspect of a practitioner's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care.…"

[9] *Anton* involved full membership staff privileges, not the type of temporary staff privileges at issue here. (*Anton*, *supra*, 19 Cal.3d at pp. 824–825)

and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate." (Cal. Code Regs., tit. 22, § 70703, subd. (b).) The medical staff is required to provide a means of enforcing its bylaws, including adoption of a peer review process, which is subject to the minimum procedural standards set by the statutes and by the law entitling physicians to fair procedure. (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1482.) Hospitals are obligated to materially comply with the medical staff bylaws (*El-Attar*, *supra*, 56 Cal.4th at pp. 990–991; see § 809.6, subd. (a)), and hospital governing boards are prohibited from acting in an arbitrary or capricious manner with respect to peer review matters (§ 809.05, subd. (a)).

Against that legal backdrop, we consider below the trial court's exclusion of plaintiffs' expert witness who was to offer extrinsic evidence of industry standards and practices in support of plaintiffs' interpretation of the phrase medical disciplinary cause or reason within the bylaws.

### B. Trial Court's Basis for Excluding Chenen

In July 2017, defendants filed a motion in limine to exclude Arthur Chenen as an expert for plaintiffs. In their motion, defendants argued Chenen was not a physician and had never been involved in the decision to terminate a physician's privileges; his experience was limited to representing physicians and medical staffs as an attorney. Defendants asserted Chenen's experience as a lawyer "no more qualifies him as an expert as it would qualify an attorney who has experience representing law enforcement as an expert on whether excessive force was used."

Chenen was designated by plaintiffs to opine on the nature of Tayefeh's privileges at KMC, the appropriateness of the termination of his privileges, and the structure of the bylaws. During his deposition, Chenen indicated he would testify about whether the custom and practice in the hospital peer review industry is to consider adverse action

12.

based upon a medical board accusation as a medical disciplinary cause or reason for corrective action or a restriction on privilege.

Chenen testified he had never personally made a decision to terminate a physician's staff privileges, but he had been involved in the decision whether or not to report such an adverse event to the MBC: "I make that decision frequently when advising medical staffs and hospitals whether a report has to be made. So[,] I do make that decision, although I don't actually make the report, of course." Chenen stated the basis for his opinion was predicated on his "years of experience in the field in terms of handling these kinds of matters [him]self, both as a physician's attorney, as a medical staff attorney, in other words, advising medical staffs, and also advising hospital boards in peer review matters. It's based upon the continuing legal education seminars that I go to and listen to. It's based upon the years of experience that I had in teaching medical …." Although this portion of Chenen's deposition was cut off in the record on appeal, Chenen's curriculum vitae attached to defendants' motion in limine indicates Chenen served as a faculty member at the American College of Hospital Administrators, now the American College of Healthcare Executives, from 1978 through 1985 teaching classes/seminars entitled, among others, "'Medical Staff Relations,'" "'Medical Staff Credentialing,'" and "Executive Briefing Series—'Medical Staff Discipline: From Problem to Solution.'"

At the motion in limine hearing, plaintiffs' counsel asserted Chenen was prepared to testify regarding the statutory scheme relevant to peer review and hospital reporting requirements, what a *locum tenens* privilege practice is, the credentialing process, and the distinction between a *locum tenens* physician and a fully credentialed physician. It was also anticipated he would testify about the nature of an MBC investigation and an MBC accusation against a physician.

Defendants' counsel argued there was no foundation for Chenen to testify as an expert on any topic because Chenen's sole qualification was limited to his role as an

attorney for medical staffs and hospitals. Plaintiffs' counsel maintained the fact that Chenen was not a physician was irrelevant because he was not offering an opinion on any medical standard of care, he was offering an opinion about whether revocation of a physician's staff privileges for certain conduct, in terms of industry custom and practice in hospital administration, was considered a medical disciplinary cause or reason.

The court rejected plaintiffs' counsel's argument: "[A] medical doctor who has been engaged in certain practices can testify about practices in the industry[,]" but an attorney, "just because he's represented people in those fields, does not acquire expertise or foundation." The court noted doctors who have been involved in administrative decisions "probably have the foundation to give opinions" about hospital administration issues, but the fact that someone is a lawyer and has represented people who might be experts in the area does not make the lawyer an expert in the area. The court analogized that "just because an attorney has represented a heart surgeon on many, many occasions does not give him the expertise or foundation to opine about practices in that field." The court concluded it would grant defendants' motion to exclude Chenen's testimony subject to reconsideration during trial, noting that "just because he's represented a bunch of people who probably do have the foundation doesn't give him the foundation; and, … I'm concerned about him straying into the area of instructing the jury on the law."

During trial, Dr. Allan Pont opined about what reasons for revocation of staff privileges constitute a "medical disciplinary cause or reason[]" (bylaws, § 7.5-4(C)) based on his experience in the industry, and he opined the phrase was understood to be synonymous with a hospital's statutory reporting duties under section 805. Plaintiffs thereafter sought reconsideration of the court's exclusion of Chenen as an expert witness. Plaintiffs argued Chenen should be permitted to testify that "medical disciplinary cause or reason[,]" as used in section 7.5-4(C) of the bylaws, is a term of art that conforms to and derives from California law. Moreover, counsel asserted Chenen should be permitted to testify what type of physician conduct would result in termination of staff privileges

14.

for a "medical disciplinary cause or reason." Counsel noted Pont's testimony related to his experience as an administrator, not as a physician, and Chenen had extensive experience in hospital administrative decisions.

The trial court maintained it was problematic to have an expert testify about what California statutes provide and noted again that an attorney has no foundation to testify about what is meant by these particular hospital bylaws. The court noted Pont did not give any opinion as to what the language in this particular set of bylaws meant, he testified only in a general sense about his understanding of that term. The court denied the motion for reconsideration "for the same reasons [the court] originally gave[.]"

C.    Analysis

1.    Trial Court Erred in Excluding Chenen as Unqualified

Evidence Code section 720, subdivision (a), provides that: "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.

"A trial court's decision that a proposed witness qualifies as an expert under Evidence Code section 720 is a matter within the court's broad discretion and will not be disturbed on appeal unless the [party asserting the error] demonstrates a manifest abuse of that discretion." (*People v. Jones* (2013) 57 Cal.4th 899, 949.) However, if a witness is clearly shown to be competent and demonstrates sufficient knowledge of the subject, it is error for the trial court to refuse to admit the witness's testimony. (*Brown v. Colm* (1974) 11 Cal.3d 639, 647.)

Plaintiffs argue Chenen was qualified to testify as an expert on several issues: (1) the credentialing process for physicians; (2) the different types of medical staff privileges; (3) the process due for termination of staff privileges; and (4) how the term

15.

"medical disciplinary cause or reason" is used within the industry in medical staff bylaws—i.e., the custom or usage of that term/phrase in the hospital peer review industry.

Chenen was clearly qualified to opine about industry standards and practices in regard to these topics. The trial court's concern that Chenen had no experience as a physician or a hospital administrator was misplaced. "[W]ork in a particular field is not an absolute prerequisite to qualification as an expert in that field." (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 274.) For example, "[q]ualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion." (*People v. Catlin* (2001) 26 Cal.4th 81, 131–132.) The matters in which Chenen claimed to have expertise were not clinical or medical issues for which only medical personnel would have the requisite training and experience, nor were the issues related to experiences or skills that could be garnered *only* through work as a hospital administrator. (See *People v. King* (1968) 266 Cal.App.2d 437, 445 ["The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement … the field of expertise must be carefully distinguished and limited."].)

The trial court was also concerned that Chenen's qualification derived solely from his experience practicing law in the healthcare industry, which would not necessarily translate into specialized knowledge, skill, or experience with medical staff bylaws, staff privileges, or physician discipline. For example, the trial court reasoned "a medical doctor who has been engaged in certain practices can testify about practices in the industry[,]" but an attorney, "just because he's represented people in those fields, does not acquire expertise or foundation." Yet, the record establishes Chenen's qualifications were more specific than general litigation experience inside this particular industry. Chenen testified at deposition that he had years of experience advising hospital boards, medical staffs, and physicians specifically about peer review matters, and he had been

16.

frequently involved in determining whether suspension or revocation of staff privileges for particular physician conduct required reporting to the MBC.

Chenen's qualifications are notably different from the lawyer in *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1 (*California Shoppers*), who was deemed unqualified as an expert on insurance practices because his expertise derived solely from his experience litigating bad-faith cases against insurance companies. (*Id.* at pp. 66–67.)  The decision in *California Shoppers* was an implicit recognition that litigation experience within a specific industry is simply too broad and unspecific to establish anything about what particular knowledge or experience was actually gleaned in any given case, what types of issues arose in particular cases, or how discrete litigation issues would result in knowledge of customs and standards throughout the field on any particular issue.

Unlike the attorney in *California Shoppers,* Chenan's expertise was not predicated solely on litigating cases against hospitals pertaining to general and unspecific hospital administration issues.  Rather, Chenen's experience was specific to peer review matters; he had worked as a physician's attorney and as a medical staff attorney advising medical staffs and hospital boards on peer review issues that would have directly involved reviewing, interpreting, and advising on medical staff bylaws.  He testified he frequently advised on whether physician conduct was reportable to the MBC, which would have necessarily involved detailed consideration of the industry's interpretation of the phrase "medical disciplinary cause or reason" as that is the standard for revocation of staff privileges which triggers reporting duties to the MBC.  (§ 805, subd. (b)(1)–(3) [§ 805 report shall be filed if peer review body, for a "medical disciplinary cause or reason[,]" (1) denies or rejects application for staff privileges, (2) terminates or revokes existing staff privileges, or (3) restricts staff privileges for more than 30 days in any 12-month period].)

17.

Beyond his litigation and advisory experience, which specifically related to peer review matters (not just hospital administration generally), Chenen also served as faculty for the American College of Hospital Administrators (now named the American College of Healthcare Executives) teaching classes/seminars directly related to medical staff credentialing. Chenen has also published numerous articles in The Medical Staff Counselor and the Los Angeles County Medical Association (LACMA) physician journals regarding hospital peer review, restriction of staff privileges and due process, and physician discipline. This is very different from qualification as an expert based solely on general experience in litigation against hospitals, where it would be unclear what particular issues had arisen and how those experiences translated into broad knowledge about customs or standards inside the industry.

While the trial court's discretion to determine expert qualification is necessarily broad and error is found only for abuse of discretion, the court will be nonetheless "deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury." (*Brown v. Colm*, *supra*, 11 Cal.3d at p. 647.) On this record, Chenen was *qualified* to offer an expert opinion about industry customs and standards with regard to (1) the credentialing process for physicians; (2) the different types of medical staff privileges; (3) the industry standards of the process due for termination of staff privileges; and (4) how the term "medical disciplinary cause or reason" is generally interpreted in medical staff bylaws—i.e., the custom or usage of that term/phrase in the hospital peer review setting. Chenen is qualified, based on his experience and knowledge of the peer review industry's customs and practices, to offer an opinion about the common usage and interpretation of phrases and terms within hospital bylaws and how those terms are understood in the industry. He is also qualified to offer an opinion regarding whether, in his experience and knowledge of the industry, terminations of privileges based on an MBC accusation like that against

18.

Tayefeh are typically considered to be adverse action based on a medical disciplinary cause or reason. The trial court's exclusion of expert Chenen as unqualified was error.

### 2. Error Was Not Harmless

The standard for determining whether the erroneous refusal to admit evidence constitutes grounds for reversal is well settled. A case will be reversed for trial error only when the error results in a "miscarriage of justice." (*Clifton v. Ulis* (1976) 17 Cal.3d 99, 105.) Our high court has held such a miscarriage of justice occurs when, after an examination of the entire record the appellate court "'is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Ibid.,* quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.) A "'reasonable probability'" does not mean more likely than not, but "merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) Worded differently, a "'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

The parties' central dispute was whether KMC terminated Tayefeh's staff privileges because of a medical disciplinary cause or reason. If either of the reasons given for terminating Tayefeh's staff privileges related to a medical disciplinary cause, it would trigger statutory reporting duties under section 805 as well as the notice and hearing procedures in the bylaws. (See *Alaama, supra,* 40 Cal.App.5th at p. 66.) KMC's witnesses' testimony indicated that phrase was understood to encompass physician conduct that occurred only at KMC involving KMC patients. Pont opined the phrase only related to adverse action for medical malfeasance such as the failure to take care of a patient or conduct that endangers patient care. He opined the termination of Tayefeh's privileges did not constitute a medical disciplinary action because it had nothing to do with the care or treatment of KMC patients. Pont also testified termination of staff privileges was only based on a medical disciplinary cause if it was reportable to the MBC

19.

pursuant to the hospital's statutory reporting duties—this was not reportable because the MBC already knew about its own accusation. Yang testified terminating privileges based on the allegations in the MBC accusation was not a medical disciplinary cause or reason because Tayefeh's practice with KMC had been "just fine." Goldis also testified he had received no negative quality of care issues pertaining to Tayefeh's work at KMC, and it was his understanding the termination of Tayefeh's privileges was not a medical disciplinary cause or reason because "[t]here were no active medical disciplinary issues at [KMC] regarding this physician."

Consistent with Pont's opinion that medical disciplinary reasons for terminating staff privileges were understood to be synonymous with a hospital's statutory reporting duties, plaintiffs' interpretation of what constituted medical disciplinary cause or reason was tethered to the statutory definition of that phrase as "that aspect of a licentiate's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (§ 805, subd. (a)(6).) Plaintiffs maintained termination for a failure to report the MBC accusation was an implicit indictment of Tayefeh's honesty, which necessarily implicated his professional competence, and the substance of the MBC accusation directly implicated Tayefeh's patient care and delivery abilities because it dealt with his patient examination and treatment practices.

There was some evidence to support plaintiffs' interpretation, including that Yang admitted the allegations in the accusation gave him some doubt as to Tayefeh's competency as a doctor and gave him reason to doubt Tayefeh's medical judgment; and Goldis testified the accusation was of a serious nature and emphasized Tayefeh had been prescribing controlled substances to his spouse that had an addictive quality and could be dangerous to a patient. Goldis also noted the MBC accusation potentially implicated Tayefeh's license to practice medicine. However, because of Chenen's exclusion, plaintiffs had no opportunity to counter Pont's assertions about how the phrase medical disciplinary cause or reasons was understood in the industry and whether that would have

included an MBC accusation like the one against Tayefeh for conduct unrelated to KMC or its patients.

The jury struggled with whether medical disciplinary cause or reason related to a physician's conduct that was detrimental to patient safety or patient care generally, or had to be conduct detrimental to patient care and safety specifically at KMC. The jury sent a written question to the court during deliberations inquiring whether the law regarding medical disciplinary cause or reason governed actions exclusively originating at KMC. The court consulted with counsel and provided an answer that included referring the jury to portions of the bylaws, including section 12.2-5(K), which defined medical disciplinary action as "one taken for cause or reason that involves that aspect of a practitioner's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." The jury continued to struggle, and they indicated to the court they could not reach a verdict. The court instructed the jury to continue deliberating, and the jury ultimately returned a nine-to-three verdict in favor of KMC. They found plaintiffs had not proven by a preponderance of evidence that KMC was required to give Tayefeh notice and hearing rights with respect to the termination of his privileges to treat patients at KMC.

The jury's question and their struggle to reach a verdict indicated the closeness of the question whether the termination of Tayefeh's privileges, which according to Goldis and Yang was predicated in part by the substance of the allegations in the MBC accusation, constituted medical disciplinary cause or reason. At his deposition, Chenen indicated he would testify about whether it is the custom and practice in the peer review industry to construe adverse action based upon a medical board accusation as a medical disciplinary cause or reason. This testimony was highly relevant to the question with which the jury struggled, and it was the core issue in the case. Chenen's expert testimony was the only vehicle for plaintiffs to admit extrinsic evidence of standards and customs in the industry. Further, counsel for KMC emphasized in closing that plaintiffs had

21.

proffered no evidence that termination of privileges based on the conduct alleged in the accusation qualified as a medical disciplinary cause or reason, and further noted Pont testified without contradiction that it did not constitute a medical disciplinary cause or reason. KMC's counsel closed by arguing, "Plaintiff[s'] burden is to prove this was medical disciplinary cause or reason; yet no evidence, no witnesses, no testimony. No one said that."

In its supplemental brief, KMC contends that even if Tayefeh was entitled to hearing procedures under the bylaws and he prevailed at that hearing in preserving his staff privileges, the exclusive provider agreement between KMC and Somnia stated that any physicians who had an investigation pending against them were precluded from employment with KMC. Although not framed as a harmless error argument, KMC's assertion in this regard is essentially that no error in the trial proceedings could be prejudicial in light of this agreement.

However, as discussed by the court in *Economy*, *supra*, 31 Cal.App.5th at page 1158, a hospital cannot direct a third party employer to take actions against a physician's employment (that effectively prevents the physician from exercising clinical privileges at the hospital) if the hospital itself could not take those actions without violating due process hearing procedures or statutory reporting duties under section 805. KMC cannot direct Somnia to take action against Tayefeh's employment for reasons amounting to a medical disciplinary cause or reason without affording process or reporting that termination to the MBC; if that were allowable, hospitals would be able to avoid their statutory obligations to provide the due process provided in their medical staff bylaws and could avoid reporting physicians to the state licensing board when required. (*Ibid.* [hospital cannot rely on third party contract as a way to terminate services of physicians for a medical disciplinary reason].)

Defendants also argue that even if Chenen was not properly excluded as unqualified, his proposed testimony about the "statutory scheme," the differences

between different types of staff credentials, the credentialing process for full medical staff privileges, and the MBC investigation was rightly excluded as improper and irrelevant. Specifically, because the notice and hearing procedures mandated in sections 809.1 to 809.4 do not apply to county hospitals such as KMC (§ 809.7), any testimony about those statutory requirements is irrelevant. As to the remaining applicable sections, defendants argue the trial court pointed out it was inappropriate for a witness to offer any interpretation of those statutes.

The difficulty in determining the proper role of expert testimony at trial may be an especially acute issue when the expert is a lawyer. (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178 (*Summers*).) "While an expert witness may properly testify as to custom and practice … [citation], he may not state interpretations of the law, whether it be of a statute, ordinance or … regulation promulgated pursuant to a statute [citations]." (*Elder v. Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 664.) Expert opinion on the legal interpretation of contracts has also been found inadmissible. (*Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 ["[T]he meaning of the [insurance] policy is a question of law about which expert opinion testimony is inappropriate."].)

Notwithstanding the general prohibition on expert opinion as to a question of law, in the absence of an Evidence Code section 402, hearing it is virtually impossible to determine what portions of Chenen's proposed testimony may have been properly excluded as stating legal conclusions or would risk usurping the function of the jury. Chenen was not entitled to offer an opinion about the *legal* interpretation of the terms of the bylaws, but he was entitled to offer his opinion about how those terms are used and interpreted within the industry. (*Summers*, *supra*, 69 Cal.App.4th at p. 1180; *Wolf v. Superior Court*, *supra*, 114 Cal.App.4th pp. 1354–1355 [expert testimony from attorney regarding custom and practice in the motion picture entertainment industry relevant to interpretation of written agreement].) The general topics of Chenen's proposed testimony

23.

are not facially irrelevant, particularly his opinion about industry customs and practices, and it cannot be concluded Chenen's exclusion was harmless on the ground that some unspecified portions of his testimony may have been deemed irrelevant and/or would have constituted improper legal opinion.

### 3.     Conclusion

In sum, Chenen's excluded testimony was highly relevant to the central issue in the case, and he was plaintiffs' sole witness as to industry custom and practice evidence for purposes of interpreting the bylaws.  Determining whether termination of  Tayefeh's privileges was based on a medical disciplinary cause or reason was a question the jury struggled to determine, as evidenced by their question to the court, their difficulty reaching a decision, and the lack of total agreement on the verdict ultimately rendered. (*People v. McDonald* (1984) 37 Cal.3d 351, 376 ["An error that impairs the jury's determination of an issue that is both critical and closely balanced will rarely be harmless."], overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 912–925; see *People v. Fields* (2009) 175 Cal.App.4th 1001, 1023 [speed and lack of difficulty reaching decision by jury were factors considered in determining whether more favorable result would have been reached].)  Chenen's proposed testimony would have directly related to the issue the jury struggled to decide, and there is a reasonable likelihood his opinions and testimony would have affected the outcome in plaintiffs' favor.

Given these factors, we conclude that, had Chenen's testimony not been excluded, there is a reasonable probability the jury would have rendered a verdict more favorable to plaintiffs.  (*People v. Bolin*, *supra*, 18 Cal.4th at p. 333.)  As the error is prejudicial, reversal of the judgment is warranted.

## II.     Additional Claims of Instructional Error

Plaintiffs also claim the trial court erred in refusing to give the special jury instructions plaintiffs requested.  As we reverse the judgment and remand for further

24.

proceedings consistent with this opinion, we do not reach plaintiffs' independent and additional arguments about instructional errors.

## DISPOSITION

The judgment is reversed. The trial court's order excluding Chenen is vacated, and the matter is remanded for further proceedings consistent with this opinion. Plaintiffs are awarded the costs of appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


MEEHAN, J.

WE CONCUR:


LEVY, Acting P.J.


FRANSON, J.